UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

KINGSPAN INSULATED PANELS, INC.,

       Plaintiff,

v.                                     Case No.  1:15-CV-1023

CENTRIA, INC.,                    HON. GORDON J. QUIST

       Defendant.

_____/

## OPINION

Plaintiff, Kingspan Insulated Panels, Inc., has sued Defendant, Centria, Inc., alleging in its first amended complaint three claims for declaratory relief that Kingspan does not infringe Centria's patents relating to insulated composite architectural panels, a claim for declaratory relief that one of the patents is invalid, and a state-law claim for tortious interference with a contract or a business relationship or expectancy.

Centria has filed a motion to dismiss the non-infringement declaratory judgment claims alleged in Counts I and II on the ground that Kingspan lacks standing to seek declaratory judgments on the patents asserted in those claims. Centria also moves to dismiss the tortious interference claim alleged in Count V on numerous grounds, including that the claim is barred by the *Noerr-Pennington* doctrine, preempted by federal patent law, and fails for various reasons under Michigan law. The Court heard oral argument on the motion on June 16, 2016, and the matter is now ready for decision.

For the foregoing reasons, the Court will grant Centria's motion and dismiss Counts I, II, and V.

# I. FACTS

Kingspan and Centria are competitors in the manufacture and distribution of insulated architectural building panels and the predominant firms in the industry. (ECF No. 16 at PageID.277.) Centria owns the following patents relating to architectural panels: (1) U.S. Patent No. 8,261,499 titled "Extruded Seal Plate for Horizontal Insulated Composite Architectural Panel Vertical End Joints" (the '499 patent); (2) U.S. Patent No. 8,474,202, titled "Extruded Seal Plate for Horizontal Insulated Composite Architectural Panel Vertical End Joints" (the '202 patent); and (3) U.S. Patent No. 8,661,756, titled "Insulated Metal Vertical Joint Insert" (the '756 patent). (*Id.* at PageID.276–77.) The '499 patent and the '202 patents are referred to herein as the "Seal Plate" patents, and are the two patents relevant to Defendant's motion.

On or about February 11, 2015, Centria sent a cease and desist letter to Kingspan, alleging that Kingspan's "Block Spline Vertical Joint" design infringes at least one claim of the '756 patent. (*Id.* at PageID.277; ECF No. 10-4 at PageID.88.) On March 2, 2015, Kingspan's counsel responded to Centria's February 11, 2015 letter, stating that Kingspan was "practicing the prior art" and believed that it was not infringing the '756 patent. (ECF No. 16 at PageID.277, 299.) Over the next several months, the parties communicated regarding Centria's allegations, in which Kingspan informed Centria that Kingspan's insulated panels did not infringe the '756 patent and that the '756 patent was invalid. (*Id.* at PageID.277.)

In the summer of 2015, Kingspan worked with Architectural Glass and Metal, Inc. (AGM), a specialty contractor that provides total building exterior solutions, to prepare a bid for manufacture and installation of exterior insulated building panels for submission to Clark Construction Company, the general contractor for Michigan State University's (MSU) biomedical research facility in Grand Rapids, Michigan. (*Id.* at PageID.278–79.) On July 29, 2015, Kingspan submitted a quote to AGM

2

for insulated panels totaling more than $770,000 in materials and labor for the MSU project.  (*Id.*)

Kingspan conducted several meetings and worked with AGM regarding AGM's needs for the MSU

project.  AGM prepared a bid incorporating Kingspan's quote and submitted it to Clark.  On

September 25, 2015, AGM sent correspondence to Kingspan indicating that AGM intended to

purchase the insulated wall panels from Kingspan pending final approval by MSU and receipt of a

subcontract agreement.  (*Id.*)

On September 28, 2015, AGM made a presentation to Clark and MSU representatives

regarding AGM's bid.  The understanding and expectancy at the conclusion of the meeting was that

Clark would accept AGM's bid, that AGM would be awarded the work on the project, and that

Kingspan would supply the insulated panels to AGM to install on the MSU project.  (*Id.* at

PageID.279–80.)

Centria was involved with another subcontractor bidding on the installation of insulated

panels for the MSU project.  Kingspan and Centria were the only remaining panel manufacturers

vying for this work. (*Id.* at PageID.280.)  Shortly after the September 28, 2015 meeting adjourned,

Clark informed Centria's subcontractor that AGM and Kingspan would be receiving the  work on

the MSU project.  In response, in the afternoon of September 28, Centria sent a letter to Clark and

AGM referencing the '499, '202, and '756 patents and stating:

> We are sending this letter to inform certain parties that there could be patent
> infringement on CENTRIA's Dimension Series Pressure Equalized Seal Plate
> design/parts and CENTRIA's Insulated Metal Vertical Joint design/parts.
>
> Companies who market, quote, manufacture, fabricate, contract for, approve or
> install  would be infringing if these designs/parts are copied.  CENTRIA intends to
> enforce/defend its patent rights and sue any and all parties that infringe.
>
> Please cease and desist any infringement on our patent.

(*Id.* at PageID.281.)  The products identified in Centria's letter compete with Kingspan's insulated

panels.  (*Id.* at PageID.282.)

As a result of Centria's letter, Clark insisted that Kingspan sign an agreement to indemnify all parties involved in the MSU project in order for Kingspan to proceed with its work. Kingspan declined to sign the indemnification agreement, however, because it "imposed unacceptable risk on Kingspan." (*Id.* at PageID.282–83.) Given Kingspan's unwillingness to sign the indemnification agreement, Clark informed AGM that it would not be awarding the work to AGM/Kingspan. Consequently, the other window subcontractor was awarded the contract which, then, incorporated the use of Centria's panels. (*Id.* at PageID.283.)

## II. DISCUSSION

### A.     Motion to Dismiss Counts I and II for Lack of Jurisdiction

Centria moves pursuant to Federal Rule of Civil Procedure 12(b)(1) to dismiss Counts I and II of the first amended complaint—which allege that Kingspan does not infringe the Seal Plate patents—on the ground that Kingspan lacks standing to seek declaratory relief. Rule 12(b)(1) provides for dismissal where the court lacks subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). "If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P. 12(h)(3). The plaintiff bears the burden of establishing the existence of jurisdiction. *DLX, Inc. v. Kentucky*, 381 F.3d 511, 516 (6th Cir. 2004). Federal courts are presumed to lack jurisdiction unless the record affirmatively establishes the existence of such. *Renne v. Geary*, 501 U.S. 312, 316, 111 S. Ct. 2331, 2336 (1991).

Rule 12(b)(1) motions may be brought either as a facial attack or a factual attack. *O'Bryan v. Holy See*, 556 F.3d 361, 375 (6th Cir. 2009) (quoting *Gentek Bldg. Prods. v. Sherwin-Williams Claims*, 491 F.3d 320, 330 (6th Cir. 2007)). A facial attack questions the sufficiency of the allegations in the pleading. *Id.* In a factual attack, "the district court must weigh the evidence and the plaintiff has the burden of proving that the court has jurisdiction over the subject matter." *Golden v. Gorno Bros., Inc.*, 410 F.3d 879, 881 (6th Cir. 2005). When reviewing a facial attack, a

4

court takes the allegations in the complaint as true. *Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990). In a factual attack, however, there is no presumption that the factual allegations of the complaint are true. *Id.* Centria's motion, based solely upon Kingspan's allegations, presents a facial attack in which the Court must accept Kingspan's allegations as true.

The Declaratory Judgment Act provides that "[i]n a case of actual controversy within its jurisdiction . . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). The phrase "a case of actual controversy" "refers to the type of 'cases' and 'controversies' that are justiciable under Article III of the U.S. Constitution." *3M Co. v. Avery Dennison Corp.*, 673 F.3d 1372, 1376 (Fed. Cir. 2012) (citing *Aetna Life Ins. v. Haworth*, 300 U.S. 227, 239–40, 57 S. Ct. 461, 463 (1937)). If an actual controversy exists, a party has standing to bring an action under the Declaratory Judgment Act. *Arris Grp., Inc. v. British Telecomms. PLC*, 639 F.3d 1368, 1373 (Fed. Cir. 2011). To establish Article III standing, a plaintiff must show injury-in-fact, a causal relationship between the injury and the defendant's challenged acts, and the likelihood that a favorable decision will redress the injury. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61, 112 S. Ct. 2130, 2136 (1992).

In *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 S. Ct. 764 (2007), the Supreme Court rejected the Federal Circuit's "reasonable apprehension of suit" test for declaratory judgment standing, concluding instead that the proper test "in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Id.* at 127, 132 n.11, 127 S. Ct. at 771, 774 n.11 (internal quotation marks and footnote omitted). Thus, a declaratory judgment plaintiff need not show that a defendant threatened litigation or took

other action to enforce its patent rights before there may be a justiciable controversy. *Danisco U.S. Inc. v. Novozymes A/S*, 744 F.3d 1325, 1330 (Fed. Cir. 2014).

The Federal Circuit has recognized that *MedImmune* authorized a more relaxed standard for standing in patent declaratory judgment cases, but it has also cautioned that "a lowered bar does not mean no bar at all." *Hewlett-Packard Co. v. Acceleron LLC*, 587 F.3d 1358, 1361–62 (Fed. Cir. 2009). On the one hand, a substantial controversy exists "where a patentee asserts rights under a patent based on certain identified ongoing or planned activity of another party, and where that party contends that it has the right to engage in the accused activity." *SanDisk Corp. v. STMicroelectronics, Inc.*, 480 F.3d 1372, 1381 (Fed. Cir. 2007). On the other hand, "a communication from a patent owner to another party, merely identifying its patent and the other party's product line, without more, cannot establish adverse legal interests between the parties, let alone the existence of a 'definite and concrete' dispute." *Hewlett-Packard*, 587 F.3d at 1362.

Centria argues that this standard is not met with regard to the Seal Plate patent declaratory judgment claims because Centria never communicated with Kingspan about those patents. Based on the absence of such communication, and the fact that Centria has never claimed that Kingspan's products infringe the Seal Plate patents, Centria argues that there is no "adverse legal interest" at issue to create standing. Centria further argues that Kingspan cannot rely on Centria's September 28, 2015 letter to AGM and Clark because the letter neither mentions Kingspan nor identifies any specific Kingspan product—or any specific product for that matter—and the Federal Circuit has held that a supplier cannot seek declaratory relief based solely on a threat of litigation against a customer. Kingspan responds that it has sufficiently alleged the existence of an actual controversy for which it has standing to seek a declaratory judgment of noninfringement because: (1) prior to Centria's September 28, 2015 letter, AGM signed Kingspan's standard terms and conditions, which imposed

an obligation on Kingspan to indemnify AGM; (2) Centria's charge of infringement to AGM and Clark is no different than a direct charge of infringement against Kingspan; and (3) Kingspan and AGM were the only other bidders for the insulated panel portion of the MSU project, and thus Centria's charge of infringement was clearly leveled against Kingspan's product that was part of the presentation to Clark and MSU.

The Court need not consider whether Kingspan, as a supplier, has standing to seek declaratory relief—including whether Kingspan had an obligation to indemnify Clark or AGM—because, in the Court's judgment, Centria's letter to AGM and Clark falls short of creating a "substantial controversy" as required by *MedImmune*.

The Federal Circuit has had several occasions to apply the *MedImmune* standard to noninfringement declaratory judgment actions, including in *SanDisk*, *Hewlett-Packard*, and *3M Co.* In *SanDisk*, the parties engaged in extensive discussions regarding the need for a cross-licensing agreement, including a licensing meeting in which the defendant, ST, provided the plaintiff, SanDisk, a slideshow and analysis regarding how SanDisk's products infringed specific claims of ST's patents. *SanDisk Corp.*, 480 F.3d at 1374–75. At the end of the meeting, ST's representative specifically disclaimed any intention to sue SanDisk. *Id.* at 1376. The court concluded that the facts adequately demonstrated an Article III case or controversy because ST demanded a royalty payment under its patents and had provided SanDisk a comprehensive packet of materials that included a detailed infringement analysis of SanDisk's products, and SanDisk maintained that it did not infringe ST's patents. *Id.* at 1382. The court explained that Article III jurisdiction will generally not exist "merely on the basis that a party learns of the existence of a patent owned by another or even perceives such a patent to pose a risk of infringement without some affirmative act by the patentee." *Id.* at 1381. It noted, however, that "Article III jurisdiction may be met where the

7

patentee takes a position that puts the declaratory judgment plaintiff in the position of either pursuing arguably illegal behavior or abandoning that which he claims a right to do." *Id.*

In *Hewlett-Packard*, the defendant, Acceleron, sent Hewlett-Packard (HP) a letter identifying itself as the owner of a patent which it described as relating to a product that HP manufactured. The letter also imposed a deadline on HP for informing Acceleron whether it wished to engage in discussions regarding the patent. After HP's counsel responded by requesting a standstill agreement, Acceleron sent a follow up letter imposing another deadline for response and stating that if HP did not respond by the deadline, Acceleron would understand that HP had no position on the patent or its relevance to HP's products. *Hewlett-Packard Co.*, 587 F.3d at 1361–62. The court observed that while "a communication from a patent owner to another party, merely identifying its patent and the other party's product line, without more, cannot establish adverse legal interests between the parties, let alone the existence or a 'definite and concrete' dispute," *id.* at 1362, a patent holder need not invoke "the magic words such as 'litigation' or 'infringement,'" to satisfy Article III's requirements. *Id.* The court found the dispute justiciable because, in its letters, Acceleron identified its patent as "relevant" to HP's product, imposed a short deadline on HP to respond, and insisted that HP not file suit. *Id.* at 1363. In addition, the court noted that Acceleron was solely a licensing entity whose only source of revenue was from enforcement of its patents, further indicating that Acceleron intended to enforce its patent rights. *Id.* at 1363–64.

Finally, in *3M*, the chief intellectual property counsel for the defendant, Avery, called 3M's chief intellectual property counsel stating that 3M's product "may infringe" Avery's patents and that licenses were available. 673 F.3d at 1375. Two days later, 3M's counsel told Avery's counsel that 3M had rejected Avery's offer to license the patents and inquired if Avery had any additional information for 3M to consider. *Id.* Avery's counsel responded that Avery had performed an

8

analysis of 3M's product and that Avery would send 3M claim charts. *Id.* The Federal Circuit concluded that such facts, if found by the district court, would suffice to create a justiciable controversy. The court noted that Avery, without provocation, asserted its patent rights and offered a license, that 3M had denied infringement and rejected Avery's license offer, and Avery indicated that it had analyzed 3M's product and would provide 3M claim charts. *Id.* at 1379. The court observed that Avery's counsel's use of the term "may infringe" instead of "does infringe" was immaterial in light of his offer to license Avery's patents. *Id.*

In the instant case, Centria never communicated with Kingspan about the Seal Plate patents. Centria's February 11, 2015 letter, and Kingspan's March 2, 2015 response, were both limited to the '756 patent. In other words, in contrast to *SanDisk*, *Hewlett-Packard*, and *3M*, Centria never put the Seal Plate patents "in play" in communications with Kingspan. The only possible basis for an Article III case or controversy is Centria's September 28, 2015 letter to Clark and AGM. That letter, however, fails to demonstrate the existence of a substantial controversy. While the letter states that "there *could be* patent infringement on CENTRIA's Dimension Series Pressure Equalized Seal Plate design/parts and CENTRIA's Insulated Metal Vertical Joint design/parts" (italics added), it goes on to describe the unremarkable proposition that any company that copies Centria's designs/parts would infringe. The letter closes by asking the recipients to "[p]lease cease and desist any infringement on [Centria's] patent," but it does not identify an infringing product or suggest that one even exists. In short, the letter is essentially a general notice informing the recipients that Centria intends to enforce its patents but does not suggest in the slightest that Centria believed or had concluded that any party, including Kingspan, was actually infringing its patents. Under these circumstances, no actual controversy exists between Centria and Clark/AGM or, for that matter, between Centria and Kingspan. *See Baker Hughes Oilfield Operations, Inc. v. Reedhycalog UK,*

*Ltd.*, No. 2:05-CV-931 TS, 2008 WL 345849, at *3 (D. Utah Feb. 6, 2008) ("While ReedHycalog had mailed several letters notifying Baker Hughes of issued and pending patents, these letters did not indicate that ReedHycalog had taken a position regarding infringement by Baker Hughes. While ReedHycalog was, in fact, evaluating possible infringement by Baker Hughes, the dispute had not yet become definite and concrete, touching the legal relations of parties having adverse legal interests." (internal quotation marks omitted)). Accordingly, Kingspan lacks Article III standing to assert the claims for declaratory relief in Counts I and II regarding the Seal Plate patents.

**B.**     **Motion to Dismiss Tortious Interference Claim**

    **1.**     ***Noerr-Pennington* Immunity**

Centria argues that Kingspan's state-law tortious interference claim is subject to dismissal because the claim is barred by the *Noerr-Pennington* doctrine. The *Noerr-Pennington* doctrine derives from the First Amendment's guarantee of "the right of the people . . . to petition the Government for a redress of grievances." U.S. Const. amend. I. Established in *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S. Ct. 523 (1961), and *United Mine Workers of America v. Pennington*, 381 U.S. 657, 85 S. Ct. 1585 (1985), the essence of the doctrine is that "parties who petition the government for governmental action favorable to them cannot be prosecuted under the antitrust laws even though their petitions are motivated by anticompetitive intent." *Campbell v. PMI Food Equip. Grp., Inc.*, 509 F.3d 776, 790 (6th Cir. 2007) (internal quotation marks omitted). The doctrine also extends to petitioning federal and state courts for judicial relief. *Opdyke Inv. Co. v. City of Detroit*, 883 F.2d 1265, 1273 (6th Cir. 1989) (citing *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510, 92 S. Ct. 609, 611 (1972)). While the doctrine originally arose in the context of antitrust laws, federal and state courts have extended it to other areas of federal law and state law, including claims of tortious interference. *Id.; see also*

*Agema v. City of Allegan*, No. 1:12-CV-417, 2014 WL 249374, at *8–10 (W.D. Mich. Jan. 22, 2014) (applying the *Noerr-Pennington* doctrine to a tortious interference claim), *aff'd in part and rev'd in part on other grounds*, __ F.3d __, 2016 WL 3349206 (6th Cir. June 16, 2016); *Azzar v. Primebank, FSB*, 198 Mich. App. 512, 516–17, 499 N.W.2d 793, 796 (1993) (applying the doctrine to state law breach of fiduciary duty claim).

Courts have also held that *Noerr-Pennington* immunity extends to pre-suit communications, such as demand letters and cease and desist letters. *See Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 935 (9th Cir. 2006); *Primetime 24 Joint Venture v. Nat'l Broad. Co.*, 219 F.3d 92, 100 (2d Cir. 2000); *Pennwalt Corp. v. Zenith Labs., Inc.*, 472 F. Supp. 413, 424 (E.D. Mich. 1979). The Federal Circuit has also concluded that sending pre-suit letters is a necessary component of enforcing patent rights. *Va. Panel Corp. v. MAC Panel Co.*, 133 F.3d 860, 869 (Fed. Cir. 1997) ("[A] patentee must be allowed to make its rights known to a potential infringer so that the latter can determine whether to cease its allegedly infringing activities, negotiate a license if one is offered, or decide to run the risk of liability and/or the imposition of an injunction.").

The Supreme Court has crafted a narrow exception to the doctrine known as the "sham exception." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, __ U.S. __, 134 S. Ct. 1749, 1757 (2014). Under this exception, petitioning activity does not qualify if it is a mere sham. *Id.* A two-part test applies. First, a court asks whether the claim is "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits." *Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60, 113 S. Ct. 1920, 1928 (1993). The sham exception fails if an objective litigant could conclude that the suit is reasonably calculated to elicit a favorable outcome. *Id.* The second inquiry, which the court should reach only if it finds the objective inquiry met, is "whether the baseless lawsuit conceals an attempt to interfere directly with the business relationship of a competitor." *Id.* at 60–61, 113 S. Ct. at 1928.

11

Kingspan argues, rather half-heartedly, that Centria's September 28, 2015 letter to AGM and Clark is not protected by the *Noerr-Pennington* doctrine because Centria's letter had nothing to do with petitioning the government. As noted above, however, courts have found that the doctrine extends to the type of pre-suit correspondence that Centria sent to AGM and Clark. This argument thus lacks merits.

Kingspan next argues that Centria's claim of infringement in the September 28, 2015 letter falls within the sham exception because its infringement claim was objectively baseless. Initially, as noted above, Centria's letter did not accuse any party or product of infringing its patents. Rather, it merely set forth circumstances in which infringement could occur—copying by any party of Centria's designs and/or parts—and requested that Clark/AGM cease any infringing activity. Viewed in this light, the letter was merely informational and did not contain a claim of infringement that could be considered a "sham." Regardless, even if Centria's letter is considered a sham, Kingspan's own admission in its first amended complaint that it declined to sign the proposed indemnification agreement because the agreement "imposed unacceptable risk on Kingspan" undercuts Kingspan's argument. Obviously, if Kingspan believed that proceeding would have posed an unacceptable risk, there is no basis to conclude that "no reasonable litigant could realistically expect success on the merits." *Id.* at 60, 113 S. Ct. at 1928. Morever, Kingspan fails to plead facts showing that Centria knew that the '756 patent was invalid or that Kingspan's products did not infringe. For example, in its March 2, 2015 letter stating that it was not infringing the '756 patent because it was "practicing the prior art," Kingspan failed to identify any prior art from which Centria could have concluded that the '756 patent was invalid. Although Kingspan now alleges that it and Centria were direct competitors on the Oaknet School Project in 1999 and the Livingston Elementary job in 2008 and that Kingspan's panel installations on those projects constitute prior art

that should have put Centria on notice that its patent is invalid, (ECF No. 16 at pageID.278), Kingspan alleges no facts showing that it advised Centria that such projects constituted prior art or that Centria was aware of the particular characteristics of those panel installations. As such, Kingspan fails to allege a plausible basis for asserting the "sham litigation" exception.

Kingspan further argues that it can prove the exception through its allegations of noninfringement and invalidity in the instant case. However, even if Kingspan can establish such claims it would not mean that Centria's September 26, 2015 letter was objectively baseless. The Supreme Court has instructed that courts must "resist the understandable temptation to engage in *post hoc* reasoning by concluding that an ultimately unsuccessful action must have been unreasonable or without foundation." *Prof'l Real Estate Investors*, 508 U.S. at 60 n.5, 113 S. Ct. at 1928 n.5. In short, Kingspan's allegations fail to show that Centria had any reason to know of the facts upon which Kingspan now relies to show noninfringement and/or invalidity.

Accordingly, the *Noerr-Pennington* doctrine bars Kingspan's tortious interference claim.

## 2.      Patent Law Preemption

Kingspan's tortious interference claim is also preempted by patent law. The patent law preemption analysis is similar to the *Noerr-Pennington* analysis. In *Globetrotter Software, Inc. v. Elan Computer Group, Inc.*, 362 F.3d 1367 (Fed. Cir. 2004), the Federal Circuit held "that federal patent law preempts state-law liability for a patentholder's good faith conduct in communications asserting infringement of its patent and warning about potential litigation." *Id.* at 1374. In other words, state law claims survive federal preemption only to the extent such claims are based on a showing of bad faith in asserting infringement. *Id.* The *Globetrotter* court explained that the "bad faith" standard was derived from the *Noerr-Pennington* cases and requires a showing that the patentee's assertions of infringement were "objectively baseless." *Id.* at 1375–76.

In light of the foregoing analysis, Kingspan has not plausibly alleged that Centria acted in bad faith when it notified Clark and AGM of its patents.  Moreover, even if Centria's September 26, 2015 letter can be construed as a claim of infringement, Kingspan's allegations in its first amended complaint fail to allege a sufficient factual basis to conclude that Centria acted in bad faith either because it knew that one or more of its patents was invalid or because it knew that its (implied) claim of infringement was baseless.[1]

### III.  CONCLUSION

For the foregoing reasons, the Court will grant Centria's partial motion to dismiss Kingspan's first amended complaint.  Counts I and II will be dismissed for lack of jurisdiction and Count V will be dismissed based on the *Noerr-Pennington* doctrine and patent preemption.

An Order consistent with this Opinion will enter.


Dated:  August 4, 2016                             /s/ Gordon J. Quist
                                            GORDON J. QUIST
                                    UNITED STATES DISTRICT JUDGE

---

[1] In light of the Court's conclusions that Kingspan's tortious interference claim is barred and/or preempted by federal law, the Court need not consider whether Kingspan's claim is viable under state law.

14