UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

KINGSPAN INSULATED PANELS
INC.,

      Plaintiff,

v.                                                    Case No. 1:15-CV-1023

CENTRIA GP and CENTRIA, INC.,         HON. GORDON J. QUIST

      Defendants.
_____/

## CLAIM CONSTRUCTION MEMORANDUM

### I. BACKGROUND

Plaintiff, Kingspan Insulated Panels, Inc., sued Defendant Centria, Inc. (Defendants Centria GP and Centria, Inc. are collectively referred to herein as Centria), alleging various claims, including claims for a declaratory judgment of non-infringement and invalidity with regard to certain of Centria's patents relating to insulated composite architectural panels. On August 4, 2016, the Court granted Centria's motion to dismiss certain claims in Kingspan's amended complaint, leaving Counts III and IV of the amended complaint at issue; both concern U.S. Patent No. 8,661,756, titled "Insulated Metal Vertical Joint Insert" (the '756 patent). Count III requests a declaratory judgment of non-infringement, and Count IV requests a declaratory judgment of invalidity. Centria has since filed a counterclaim alleging that Kingspan infringed the '756 patent.

The '756 patent describes an insulated vertical joint insert for a composite panel wall assembly. The Summary of Invention describes one embodiment as follows:

> [A] composite panel assembly includes first and second panels. An edge of the first panel is positioned adjacent to an edge of the second panel to define a joint. The edge of the first panel and the edge of the second panel each define a recessed

portion.  An insert is positioned between the first and second panels at the joint.  A portion of the insert is received within respective recessed portions of the first and second panels.

('756 patent, col. 1, ll. 47–54.) "The first and second panels may include a reveal at the joint, where the reveal is defined by the first and second panels and the insert." (*Id.*, col. 1, ll. 55–57.) The insert may comprise a foam body and a facer. (*Id.*, col. 1, ll. 57, 62–63.) Claims 1–5 and 8 of the '756 patent are in issue.

The specification of the '756 patent incorporates U.S. Patent No. 6,253,511 ( the '511 patent) and U.S. Patent No. 5,749,282 (the '282 patent) "by reference in their entirety." ('756 patent col. 1, ll. 41–43.)  This statement suffices to incorporate the entire prior art references into the '756 patent.  *See Harari v. Lee*, 656 F.3d 1331, 1335–36 (Fed. Cir. 2011).

Pursuant to *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 116 S. Ct. 1384 (1996), the Court heard argument from the parties on December 14, 2017, regarding their respective proposed constructions of disputed claim terms.  The Court granted the parties leave to file post-hearing briefs to address certain arguments pertaining to claim terms "recessed" and "foam" that Kingspan's counsel initially raised during the hearing, and the parties have filed their respective briefs.  The parties dispute the meaning of thirteen claim terms, although the actual disputes center around seven of those terms.

## II. CLAIM CONSTRUCTION RULES

Construction of patent claims is a matter of law.  *See Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1454–56 (Fed. Cir. 1998) (en banc).  When there is a dispute regarding the meaning of language used in a claim, the court must ascertain the scope of the exclusive rights claimed in the patent.  *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc), *aff'd* 517 U.S. 370, 116 S. Ct. 1384 (1996).  "The purpose of claim construction is to give claim terms

the meaning understood by a person of ordinary skill in the art at the time of invention." *Mass. Inst. of Tech. v. Shire Pharms., Inc.,* 839 F.3d 1111, 1118 (Fed. Cir. 2016) (citing *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–14 (Fed. Cir. 2005) (en banc)).

> It is well settled that the role of a district court in construing claims is not to redefine claim recitations or to read limitations into the claim to obviate factual questions of infringement and validity but rather to give meaning to the limitations actually contained in the claims, informed by the written description, the prosecution history if in evidence, and any relevant extrinsic evidence.

*Am. Piledriving Equip., Inc. v. Geoquip, Inc.*, 637 F.3d 1324, 1331 (Fed. Cir. 2011) (citing *Phillips*, 415 F.3d at 1314).

In applying the rules of claim construction, the Court is guided by the Federal Circuit's en banc decision in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005). Proper claim construction begins with the language of the claims themselves. *See Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). "It is a 'bedrock principle' of patent law that 'the claims of the patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips*, 415 F.3d at 1312 (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). Claim terms should be given their ordinary and customary meanings as they would be understood by "a person of ordinary skill in the art in question at the time of the invention, i.e, as of the effective filing date of the patent application." *Id.* at 1313. This "starting point is based on the well-settled understanding that inventors are typically persons skilled in the field of the invention and that patents are addressed to and intended to be read by others of skill in the pertinent art." *Id.* A court departs from the ordinary meaning rule only in two instances: "1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of a claim term either in the specification or during prosecution." *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012).

3

A district court need not engage in claim construction in all instances. "In some cases, the ordinary meaning of claim language . . . may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Phillips*, 415 F.3d at 1314; *see also Mentor H/S, Inc. v. Med. Device Alliance, Inc.*, 244 F.3d 1365, 1380 (Fed. Cir. 2001) (concluding that the district court did not err in relying on the ordinary meanings of the claim terms "irrigating" and "frictional heat"). However, if the meaning of a term as understood by persons skilled in the art is not immediately apparent, or the parties dispute the scope of the claim language, the court must look to available sources to determine the meaning. *Phillips*, 415 F.3d at 1314; *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1361 (Fed. Cir. 2008).

A court may consult both the intrinsic and extrinsic evidence to construe a claim. Intrinsic evidence—the most important resource—includes the patent claims themselves, the patent specification, and the prosecution history. *Phillips*, 415 F.3d at 1314. Because the specification is part of the integrated instrument, the claims "'must be read in view of the specification.'" *Id.* (quoting *Markman*, 52 F.3d at 978). The specification "is relevant not only to aid in the claim construction analysis, but also to determine if the presumption of ordinary and customary meaning is rebutted." *Brookhill-Wilk 1, LLC v. Intuitive Surgical, Inc.*, 334 F.3d 1294, 1298 (Fed. Cir. 2003). In fact, the specification "is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Vitronics*, 90 F.3d at 1582. The prosecution history is also useful because it may "inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Phillips*, 415 F.3d at 1317.

4

Extrinsic evidence includes dictionaries, treatises, and expert or inventor testimony. *Id.* Such evidence, while "less significant than the intrinsic record in determining 'the legally operative meaning of claim language,'" *id.* (quoting *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 862 (Fed. Cir. 2004)), may assist a district court in understanding "the background science or the meaning of a term in the relevant art during the relevant time period." *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, — U.S. —, 135 S. Ct. 831, 841 (2015).

Although there is no rigid process to divine the correct meaning of a claim term, "the court's focus [must] remain[] on understanding how a person of ordinary skill in the art would understand the claim terms." *Phillips*, 415 F.3d at 1323. This means that the court should resist the temptation to import limitations from the specification into the claims. *Id.* Thus, "'[t]he construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction.'" *Id.* at 1316 (quoting *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1995)).

The parties agree that a person of ordinary skill in the art in this case is a person having at least a bachelor's degree in civil, architectural, or mechanical engineering and at least 4-5 years of relevant industry experience.

### III. ANALYSIS

Claim 1 of the '756 patent, which is representative of claims 2–5, provides:

1. A composite panel assembly comprising:

first and second panels, an edge of the first panel is configured to be positioned adjacent to an edge of the second panel to define a joint, with the edge of the first panel and the edge of the second panel each defining a recessed portion, the first and second panels comprising an outer sheet and an inner sheet with a foam core positioned between the outer and the inner sheet, a portion of the inner sheet and the foam core of each of the first and second panels is recessed relative to the remaining

portion of the foam core and the outer sheet of each of the first and second panels to define the respective recessed portions of the first and second panels; and

an insert configured to be positioned between the first and second panels at the joint when the first and second panels are positioned adjacent to each other, with a portion of the insert configured to be received within the respective recessed portions of the first and second panels, the insert comprising an insulating body.

(*Id.* at col. 9, l. 28–col. 10, l. 4.) Claim 8 provides:

8. The composite panel assembly of claim 1, wherein the first and second panels each include an extended portion at the joint to form a reveal.

(*Id.* at col. 10, ll. 37–39.)

### *Disputed Claim Terms*

### 1. "recessed"

Centria proposes a construction of **"built back,"** while Kingspan offers a construction of **"indented."** The term "recessed" in Claim 1 is used as an adjective to describe a portion of the composite panel. More specifically, the term is used to describe the relationship between a portion of the inner sheet and foam core relative to the remaining portion of foam core and the outer sheet at the edge of the panel.

Centria relies on the definition of "recess" from the New Oxford American Dictionary as the primary basis for its proffered construction, and argues that "built back" is consistent with Figure 2 of the '756 patent specification, which shows that a portion of the edge of the panel is built back from the remaining edge of the panel. Centria also argues that its construction is consistent with the claim language, which describes a portion of the panel, including the inner sheet, as being built back, or not extending as far toward the joint as the outer panel. (ECF No. 69 at PageID.1030–31.)

Kingspan argues that its proposed construction of "indented" is supported by the file history, including the provisional application and the non-provisional application. In particular, Kingspan

6

notes that in the later-filed non-provisional application, the applicant substituted the term "recessed portion" for the word "notch" in the earlier provisional application. (*Compare* ECF No. 70-2 at PageID.1159 *with* ECF No. 70-1 at PageID.1149–50.) Kingspan also notes that during prosecution, in its efforts to distinguish the prior art, the applicant never referred, directly or otherwise, to Centria's proposed term "built back."

As an initial matter, the Court rejects Centria's argument that the incorporated '511 patent shows that the patentee assigned different meanings to the terms "recessed" and "indented." Referring to a "reveal" in the context of a building wall assembly, the '511 patent specification describes a reveal as "an *indentation* that is *recessed* into a wall assembly." ('511 patent, col. 6, ll. 27–29 (italics added).) The quoted language actually shows that the patentee used the two terms interchangeably. This is confirmed by claim 6 of the incorporated '282 patent, which describes "gutter means" as "a trough-like *recess* being *indented* into said structural foam core." ('282 patent, col. 5, ll. 21–22 (italics added).) Regardless, based on its review of the specification and claim language, the Court declines to construe "recessed" because nothing indicates that the patentee used the term in a manner inconsistent with or different from its plain and ordinary meaning. As Kingspan concedes in its opening brief, "'[r]ecessed' is a simple, non-technical term." (ECF No. 70 at PageID.1129.) As such, it "is used in common parlance and has no special meaning in the art." *Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1291 (Fed. Cir. 2015) (holding that the district court did not err by declining to construe the term "[b]eing provided to"); *see also Activevideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1325–26 (Fed. Cir. 2012) (holding that the district court did not err under *O2 Micro* in concluding that the claim terms had "plain meanings that d[id] not require additional construction"). The term "recessed," as used in the context of the claim language, requires no construction.

7

## 2. "outer sheet" & "inner sheet"

The pertinent claim language is "the first and second panels comprising an outer sheet and an inner sheet with a foam core positioned between the outer and the inner sheet." Centria proposes **"outer face" and "inner liner,"** while Kingspan argues that the terms should be given their **plain and ordinary meanings**.

As with "recessed," the Court finds that "outer sheet" and "inner sheet"—simple, nontechnical terms—should be given their plain and ordinary meanings. Centria's primary argument is that "the specification is replete with examples" using "outer face" and "inner liner" interchangeably with "outer sheet" and "inner sheet" and the proposed constructions are consistent with multiple dictionary definitions. (ECF No. 69 at PageID.1033–34.) However, Centria fails to cite any persuasive basis to overcome the presumption that terms "outer sheet" and "inner sheet" should be given anything other than their plain meanings, even if the patentee did use the terms "outer face" and "inner surface" throughout the specification. *See N. Telecom Ltd. v Samsung Elecs. Co.*, 215 F.3d 1281, 1291 (Fed. Cir. 2000). There is no indication that the patentee intended a special definition of these terms, there is no disavowal, and Centria has not shown that "outer sheet" and "inner sheet" have special meanings in the art. Centria also argues that its proposed constructions do not improperly import limitations from the specification, but instead serve to "provide clarity and prevent possible confusion of the fact finder because the '756 Patent and the Incorporated '511 Patent use these terms and Centria's proposed constructions for these terms interchangeably." (ECF No. 71 at PageID.1240.) But because the claim terms themselves have a plain meaning that would be clear to even a lay judge, any ambiguity or confusion created by the specification's use of different terms is of no moment. *See Ancora Techs., Inc. v. Apple, Inc.*, 744 F.3d 732, 738 (Fed. Cir. 2014) (stating that because "the terms at issue have so clear an ordinary

meaning[,] . . . a skilled artisan would not be looking for clarification in the specification"); *cf. Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002) ("The specification may assist in resolving ambiguity where the ordinary and accustomed meaning of the words used in the claims lack sufficient clarity to permit the scope of the claim to be ascertained from the words alone.").

### 3. "foam"

Centria proposes **"a structural foam material,"** and Kingspan proposes **"a foam material."** This term refers to the "foam core positioned between the outer sheet and the inner sheet." The dispute is limited to whether the term "foam" has a structural limitation.

Centria's construction relies principally upon the claims and specifications of the '282 patent and the '511 patent which, as noted above, the '756 patent specification incorporates by reference. In particular, Centria notes that both incorporated patents make clear that the "foam" used in their composite panel assemblies is "structural foam." For example, claims 1 and 6 of the '282 patent both specify a "structural foam core," as does the specification. ('282 patent, col. 2, ll. 65–67; col. 4, ll. 40–41; col. 5, ll. 21–22.) The '511 patent contains identical language referring to a "structural foam core." ('511 patent, col. 12, ll. 40–43.) Centria argues because the '282 and '511 patents are incorporated by reference, it "necessarily follows" that the '756 patent's reference to foam also means "structural foam." (ECF No. 69 at PageID.1035.)

Centria stretches the incorporation by reference doctrine beyond its proper limits. The Federal Circuit has held that "incorporation by reference does not convert the invention of the incorporated patent into the invention of the host patent." *Modine Mfg. Co. v. United States Int'l Trade Comm'n*, 75 F.3d 1545, 1553 (Fed. Cir. 1996), *overruled on other grounds by Festo Corp. v. Shoketu Kinzoku Kogyo Kabuchiki Co.*, 234 F.3d 558 (Fed. Cir. 2000). In *Modine Manufacturing*,

the court rejected that patentee's argument that the term "relatively small" in the host '580 patent should be construed to include a diameter of up to 0.07 inches because the specification of the incorporated '311 patent defined the term "relatively small" as "0.07 inches or less." *Id.* The court concluded that in view of the replacement of the "'relatively small' parameter of about 0.070 in the grandparent application with the 'relatively small' parameter of about 0.040 in the parent and child applications, it does not appear to be correct to read the scope of 'relatively small' in the '311 patent as overriding that replacement." *Id.*; *see also Fifth Generation Computer Corp. v. Int'l Bus. Machs. Corp.*, 416 F. App'x 74, 80 (Fed. Cir. 2011) (stating that because "the #024 patent claims are clear in claiming a complete computer system, including specific functionality of the single root bus controller within that computer system," it would be "inappropriate to look to the incorporated references to arrive at a stretched reading of those claim limitations").

In the instant case, the term "structural foam" is absent from the '756 patent, and nothing in the patent itself indicates that "foam" is always structural in nature. The teaching of *Modine Manufacturing* thus applies here: the Court may not import the "structural" limitation from the incorporated patents into the claim at issue. The patentee's use of the term "structural" to modify "foam" in the incorporated patents "strongly implies" that foam is not inherently structural in nature. *See Phillips*, 415 F.3d at 1314 (noting that a claim's reference to "steel baffles" "strongly implies that the term 'baffles' does not inherently mean objects made of steel"). For whatever reason, during the prosecution of the '756 patent, the applicants chose to omit the "structural" reference set forth in the incorporated patents when they amended claim 1 to add the "foam core" language following the examiner's initial rejection. (ECF No. 70-6 at PageID.1197.) The Court may not now add a limitation that the patentees intentionally omitted.

Accordingly, "foam" is construed as "a foam material."

### 4. "received within the respective recessed portions of the first and second panels"

In context, the claim language is "with a portion of the insert configured to be received within the respective recessed portions of the first and second panels." Centria proposes a construction of **"received into and engaged by the respective built back portions of the first and second panels such that the insert is clamped in place."** Kingspan proposes, **"received within the respective indented portions of the first and second panels."** The dispute, therefore, is whether the claim language should be construed to include the limitations *engage*d and *the insert is clamped in place*.

Centria turns to the specification to support its construction. For example, Centria notes, the specification states: (1) "As shown in FIG. 2, each of the panels 10, 12 defines a recessed portion 46 at the vertical joint 16 for receiving and engaging the joint insert 40 thereby holding the insert 40 in place" ('756 patent, col. 4, ll. 2–5); (2) "[T]he joint insert 40 is positioned within the vertical joint 16 and the fasteners 26 are installed such that the joint insert 40 is clamped in place by the panels 6, 8, 10, 12. As shown in FIG. 2, the panels 10, 12 engage the facer 44 at a position adjacent to the recessed portions 46. The receiving and engagement of the insert 40 by the panels 10, 12 ensures the insert 40 remains in place after installation" (*id.*, col. 4, ll. 52–58); and (3) "The receiving and engaging of the joint insert 40 by the panels 10, 12 enables the width of the vertical joint 16 to have a larger tolerance . . . ." (*Id.*, col. 5, ll. 6–11.) Centria also notes that "in every embodiment disclosed in the '756 Patent specification, the insert cannot be removed after installation," and the specification's repeated descriptions "of this critical design feature reflect one of the important ways in which the patentee sought to distinguish prior art systems that use flexible gaskets to seal vertical joints between adjacent panels." (ECF No. 69 at PageID.1039 (emphasis in

original).) Centria argues that the specification's disparagement of gasket joint systems effectively disavows claim scope, and supports reading "engaged" and "clamped in place" as limitations.

Kingspan argues that the claim language itself does not support Centria's proposed limitations and that Centria's reliance on the statement that "the insert cannot be removed after installation" is improper because claim 1 is not a method claim. Kingspan also argues that the patentee's mere discussion of the shortcomings of the prior art is not the type of disavowal that allows for a limitation to be imported into a claim.

As already noted above, "the claim construction inquiry . . . begins and ends in all cases with the actual words of the claim." *Homeland Housewares, LLC v. Whirlpool Corp.*, 865 F.3d 1372, 1375 (Fed. Cir. 2017) (internal quotation marks omitted). It is thus "[t]he claim language [that] defines the bounds of claim scope." *Teleflex*, 299 F.3d at 1324. However, a court must also consider the specification and remainder of the patent. "[C]laims are to be construed in the light of the specifications and both are to be read with a view to ascertaining the invention." *United States v. Adams*, 383 U.S. 39, 49, 86 S. Ct. 708, 713 (1966). A court may examine the specification to ascertain whether the patentee intended a special definition for a claim term or whether the patentee limited the scope of the claim by intentional disclaimer or disavowal. *Phillips*, 415 F.3d at 1316. But "it is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited." *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004).

In the Court's judgment, Centria's proposed construction invites the Court to commit one of the "cardinal sins of patent law—reading a limitation from the written description into the claims[.]" *Phillips*, 415 F.3d at 1320 (internal quotation marks omitted). To begin, nothing in the

claim language itself supports reading limitations from the specification into the claim. *See Cont'l Paper Bag Co. v. E. Paper Bag Co.*, 210 U.S. 405, 419, 28 S. Ct. 748, 751 (1908) ("[I]n making his claim the inventor is at liberty to choose his own form of expression; and while the courts may construe the same in view of the specifications and the state of the art, they may not add to or detract from the claim.") (internal quotation marks omitted). Neither the claim language nor the specification indicates that the patentee intended that the term "received" has anything other than its ordinary meaning or that it be limited in any respect. *Cf. Beckmann v. Gandhi*, 646 F. App'x 950, 960–61 (Fed. Cir. 2016) ("Although the specification of the #605 patent describes various means for controlling the exhaust gas composition and duration of the exhaust gas supplying steps, those descriptions are not part of claim 1. Indeed, the language of claim 1 does not specify any means by which to *control* the exhaust gas composition and duration beyond the requirement that the $NO_x$ catalytic converter be 'suppl[ied]' with a certain type of exhaust gas in each of the supplying steps."). Turning to the remainder of the patent, in describing the invention—the joint insert—the Abstract states that it is "positioned between the first and second panels at the joint," and "[a] portion of the insert is received within respective recessed portions of the first and second panels." The Abstract does not convey that the insert is engaged by the recessed portions or is clamped in place. Likewise, the Summary of Invention omits any reference to such limitations: "An insert is positioned between first and second panels at the joint. A portion of the insert is received within respective recessed portions of the first and second panels." ('756 patent, col. 1, ll. 51–54.) While the preferred embodiments do criticize the prior art, the Court is not persuaded that such criticism amounts to an "expression[] of manifest exclusion or restriction, representing a clear disavowal of claim scope." *Teleflex*, 299 F.3d at 1325. Nor does the specification's criticism constitute disavowal by disparagement. Neither "[a] patentee's discussion of the shortcomings of certain

techniques," *Epistar Corp. v. Int'l Trade Comm'n*, 566 F.3d 1321, 1335 (Fed. Cir. 2009), nor "statements about the difficulties and failures in the prior art," are alone sufficient to disavow claim scope. *Retractable Techs., Inc. v. Becton, Dickinson & Co.*, 653 F.3d 1296, 1306 (Fed. Cir. 2011). This is particularly true in the instant case in light of the lack of support in the claim language for Centria's proposed construction.[1]

Accordingly, the Court adopts the disputed claim language without modification.

### 5. "an insulating body"

Centria proposes **"a body that insulates better than a gasket,"** while Kingspan says that the term should be given its **plain and ordinary meaning**. In context, the language is "the insert comprising an insulating body."

The issue here is basically the same as the issue with the previous disputed term—whether the specification's discussion of rubber gaskets constitutes a disavowal of claim scope that limits an insulating body to one that insulates "better than a gasket." Centria cites the following passage from the specification:

> The joint insert 40 insulates the vertical joint 16 substantially better than conventional rubber gaskets. More specifically, conventional rubber gaskets typically have trapped air and results in an R1 insulation value for the vertical joint. The joint insert 40, which in one non-limiting embodiment is 3/4" thick, can achieve an R5 insulation value for the joint width. Increasing the thickness of the panels 10, 12 allows for a thicker joint insert 40 (in a direction that extends from the outer surface 34 to the inner surface 32) such that the insulation value for the joint width can be increased whereas increasing the thickness of conventional rubber gaskets does not yield similar increases in insulation value at the joint width.

---

[1] The Court finds *In re Abbott Diabetes Care Inc.*, 696 F.3d 1142 (Fed. Cir. 2012)—upon which Centria relies—distinguishable from the instant case. The issue was whether the term "electrochemical sensor" excluded external cables and wires connecting the sensor to its control unit. *Id.* at 1148. The court noted that "the claims themselves suggest connectivity without the inclusion of cables or wires." *Id.* at 1149. Such is not the case here with regard to "engaged" and "clamped in place."

14

('756 patent, col. 4, l. 58–col. 5, l. 4.) Centria thus argues that the purpose of the invention was to provide a better insulation value than the prior gaskets. Centria notes that the plain meaning of the term "insulate" is to "protect (something) by interposing material that prevents the loss of heat." (ECF No. 69 at PageID.1041 (quoting The New Oxford American Dictionary at 881 (2001).) It argues that an "insulating body" is thus designed to prevent the loss of heat, whereas prior art gaskets are designed merely to seal a joint against the flow of water. In this regard, Centria cites the specification from the incorporated '282 patent, which states that "[t]he gasket means 82 preferably is formed from flexible rubber to provide an efficient seal and to aid in the installation thereof," ('282 patent col. 4, ll. 1–3), and the specification from the incorporated prior art '511 patent, which indicates that gaskets can be used to keep water out of the vertical joint. ('511 patent col. 14, ll. 54–59.)

Kingspan argues for the plain and ordinary meaning because claim 1 does not include the "better than a gasket" limitation, there is no support in the specification for Centria's proposed construction, and the '756 patent specification refutes Centria's argument because the specification says that even conventional rubber gaskets have an R1 insulation value ('756 patent col. 4, ll. 60–62), indicating that rubber gaskets do in fact have insulating properties. Kingspan also argues that Centria's reliance on the statement "[t]he joint insert 40 insulates the vertical joint 16 substantially better than conventional rubber gaskets" from the specification is simply a statement of degree, and not a wholesale rejection of prior art gasket joints that is required for a disavowal.

For substantially the same reasons cited above for the claim term "received within the respective recessed portions of the first and second panels," the Court concludes that this term should be given its plain and ordinary meaning. In other words, the Court finds that Centria's proposed "better than a gasket" language constitutes importation of a claim limitation, which is

15

improper, rather than proper claim construction. *See Liebel-Flarsheim Co.*, 358 F.3d at 905 ("The problem is to interpret claims in view of the specification without unnecessarily importing limitations from the specification into the claims." (internal quotation marks omitted)). First, nothing in the claim language or the specification suggests that the term "insulating body" has a special meaning; it is a body that insulates. Second, although the specification points out that prior art rubber gasket systems do not insulate as well as foam inserts, nothing in the specification indicates a clear disclaimer. The specification criticizes, but does not exclude, gaskets, as it provides that "the body may be an insulating foam block . . . although the body may be formed from any other suitable insulating material." ('756 patent, col. 4, ll. 29–30, 32–33.) The specification itself says that rubber gaskets provide *some* insulation, even if it is a minimal R1 value. Finally, the Court concludes that specification's criticism of prior art gaskets as an insulating feature is not, without more, a clear disavowal. *See Epistar Corp.*, 566 F.3d at 1335 ("A patentee's discussion of the shortcomings of certain techniques is not a disavowal of the use of those techniques in a manner consistent with the claimed invention.").

### 6. "reveal"

The term "reveal" appears in claims 2 and 8. The pertinent language of claim 2 is "wherein the first and second panels include a vertical reveal at the joint with the vertical reveal defined by the first and second panels and the insert," and for claim 8 is "the first and second panels each include an extended portion to form a reveal." Centria proposes **"an indentation that is recessed (i.e., built back) into the wall assembly,"** and Kingspan proposes **"exposed feature."**

Centria argues that the Court need look no further than the specification of the incorporated '511 patent, which provides: "Indicated at 192 is what is known in the art as a reveal, or in the context of a building wall assembly, an indentation that is recessed in the wall assembly." At the

16

*Markman* hearing, Centria's counsel offered three bases for adopting its construction: (1) the specification provides an express definition by the patentee; (2) Kingspan's admission in its brief that the specification defines the term "precisely as it would be understood by one having ordinary skill in the art" (ECF No. 72 at PageID.1277); and (3) lexicography. Finally, Centria argues that Kingspan's definition is so broad that it is practically meaningless because it encompasses components such as the outwardly-visible panel sheet.

Kingspan argues Centria's reliance on the statement from the '511 patent is misplaced because it has none of the hallmarks of lexicography and simply describes the term "reveal" as it would be understood by one having ordinary skill in the art. In other words, Kingspan argues, the patentee used the term as it is commonly understood. Finally, Kingspan argues that claims 2 and 8 actually provide a definition for "reveal."

The Court declines to adopt either party's proposed construction. First, the statement in the '511 patent specification is not lexicography. "A patentee can act as his own lexicographer, but, to do so, a patentee must clearly set forth a definition of the disputed claim term other than its plain and ordinary meaning and must clearly express an intent to redefine the term." *Cadence Pharms. Inc. v. Exela Pharmsci Inc.*, 780 F.3d 1364, 1369 (Fed. Cir. 2015) (quoting *Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1371 (Fed. Cir. 2014)). The patentee noted that a reveal is a well-known feature in the art and simply described this well-known feature by reference to its structure in a wall-panel assembly. The patentee did not redefine the term. Second, the Court does not construe Kingspan's counsel's statements in its response brief as an admission that the patentee's description of a reveal is a controlling definition. Rather, counsel was merely commenting that the patentee referred to a reveal as it is commonly understood in the art. Finally, even if the statement in the specification can be considered a definition by the patentee, claims 2 and 8 each includes a

reference to structure that may define a reveal. There is no reason to prefer the statement from the '511 patent specification over the claims themselves. As for Kingspan's definition, "exposed feature," the Court agrees with Centria that it is too indefinite to limit its application to a reveal. While a reveal is certainly an "exposed feature," so too are the wall panels themselves, as well as the facers.

In light of the foregoing, and in view of the language of claims 2 and 8, the Court construes "reveal" as a recessed joint between wall panels.

### 7. "facer secured to the insulating body"

The disputed language is found in claim 5, which states: "The composite panel assembly of claim 1, wherein the insert further comprises a facer secured to the insulating body." Centria initially proposed "outwardly visible elongate strip of material that is adhered or attached to the insulating body," but through briefing, modified its proposed construction to omit "elongate" because the specification states that "other suitable shapes may be utilized for the facer 44." ('756 patent, col. 9, ll. 9–12.) Kingspan proposes "outward facing material that is connected to or part of the insulating body."

The primary dispute at the hearing was whether the facer must be a separate component and attached to the insulating body, or whether the facer may be part of, or incorporated in, the insulating body. At the hearing, however, counsel narrowed, but did not resolve, their differences. In particular, Kingspan's counsel conceded that the facer is a separate component attached to the insulating body, and agreed to **"outwardly visible material that is adhered or attached to the insulating body."** Centria's counsel insisted on **"outwardly visible *component* that is adhered or attached to the insulating body."** Centria's counsel's concern was that without the term

18

component, the definition would be susceptible to an argument that the facer and insulating are integrated.

The Court adopts Kingspan's construction, as it consistent with the specification ('756 patent col. 4, ll. 24–26 ("The facer 44 may be metal, . . . although other suitable materials may be used for the facer.")), and the phrase "adhered or attached to the insulating body" addresses Centria's concerns about the facer and insulating body constituting separate parts or elements.

Dated: March 12, 2018 /s/ Gordon J. Quist
GORDON J. QUIST
UNITED STATES DISTRICT JUDGE